**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-25-00011-CV**
_____

**JOSE LUIS MARTINEZ LARA, Appellant**

**V.**

**SAN JUANITA MEDINA, Appellee**

_____

**On Appeal from the County Court at Law No. 3**
**Montgomery County, Texas**
**Trial Cause No. 23-09-13179-CV**
_____

**MEMORANDUM OPINION**

San Juanita Medina ("Appellee") filed suit in 2023 against Jose Luis Martinez Lara ("Appellant") to establish an informal or common-law marriage to Appellant and for a divorce and property division.[1] The informal marriage and property issues were bifurcated and tried separately. After the first bench trial, the trial court signed

---

[1] According to the pleadings, the testimony, and the Final Divorce Decree, there were no children of the marriage.

1

an Order Confirming Common Law Marriage in Suit for Divorce and found the existence of an informal marriage and declared that Appellant and Appellee were married. After a second bench trial, the trial court signed a Final Decree of Divorce and found that the parties married on March 1, 2017, granted the parties a divorce, and divided the marital estate. Appellant appealed. In four issues, Appellant argues that (1) there was legally and factually insufficient evidence to support the trial court's finding of a common law marriage, (2) the trial court erred in determining that certain property was not Appellant's separate property, (3) the trial court abused its discretion in excluding five exhibits offered by Appellant at trial, and (4) the trial court erred in denying Appellant's reimbursement claim against the community for repairs and improvements made to certain property in the divorce. We affirm the trial court's judgment.

## Common-Law Marriage

In his first issue, Appellant challenges the legal and factual sufficiency of the evidence supporting the trial court's finding of a common-law marriage. According to Appellant, the statutory conditions to establish a common-law marriage were not established because Appellee failed to demonstrate any clear agreement between the parties to be married, the parties cohabitated for purposes of convenience and not in the context of a marital relationship, and there is no credible evidence that both parties represented themselves as married.

2

Standard of Review

When the trial court conducts a bench trial but makes no findings of fact and conclusions of law, it is implied that the court made all findings necessary to support its judgment. *Sixth RMA Partners, L.P. v. Sibley*, 111 S.W.3d 46, 52 (Tex. 2003); *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002); *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990). If, as here, the appellate record includes the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency. *See Scott v. Scott*, No. 09-97-471 CV, 1999 Tex. App. LEXIS 6447, at *2 (Tex. App.—Beaumont Aug. 26, 1999, no pet.) (mem. op., not designated for publication) (citing *Roberson v. Robinson*, 768 S.W.2d 280, 281 (Tex. 1989)).

When a party attacks the legal sufficiency of an adverse finding on which the party did not have the burden of proof, the party must demonstrate on appeal that no evidence supports the finding. *Graham Cent. Station, Inc. v. Peña*, 442 S.W.3d 261, 263 (Tex. 2014). We credit favorable evidence if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Evidence is legally sufficient if it "would enable reasonable and fair-minded people to reach the verdict under review." *Id.* The factfinder is the sole judge of the credibility of the witnesses and is responsible for resolving any conflicts in the evidence, weighing the evidence, and

drawing reasonable inferences from basic facts to ultimate facts. *Id.* at 819-21; *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004). When considering a legal sufficiency point, we review the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *Keller*, 168 S.W.3d at 810. Even if evidence is undisputed, it is the province of the factfinder to draw from such evidence whatever inferences it wishes so long as more than one inference is possible. *Id.* at 821. But if the evidence allows only one inference, neither the trier of fact nor the reviewing court may disregard it. *Id.* at 822. When there is conflicting evidence, it is the province of the trier of fact to resolve such conflicts. *Id.* at 820. In every circumstance in which a reasonable trier of fact could resolve the conflicting evidence either way, the reviewing court must presume the trier of fact did so in favor of the prevailing party and disregard the conflicting evidence in its sufficiency review. *Id.* at 821. If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then the factfinder must be allowed deference. *Id.* at 822. So long as the evidence falls within this zone of reasonable disagreement, we may not substitute our judgment for that of the factfinder. *Id.* The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *Id.* at 827.

When a party attacks the factual sufficiency of the evidence pertaining to a finding on which the party did not have the burden of proof, we may set aside the

4

finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Hometown Motors, LLC v. Jones*, No. 09-18-00466-CV, 2020 Tex. App. LEXIS 9235, at *12 (Tex. App.—Beaumont Nov. 25, 2020, no pet.) (mem. op.) (citing *Bennett v. Comm'n for Lawyer Discipline*, 489 S.W.3d 58, 66 (Tex. App.—Houston [14th Dist.] 2016, no pet.)). "We consider all the evidence, but we will not reverse the judgment unless 'the evidence which supports the [] finding is so weak as to [make the finding] clearly wrong and manifestly unjust.'" *Id.* (quoting *Star Enter. v. Marze*, 61 S.W.3d 449, 462 (Tex. App.—San Antonio 2001, pet. denied)); *see also Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). "When examining factual sufficiency, we examine the entire record, and the amount of evidence necessary to affirm a judgment is far less than the amount necessary to reverse a judgment." *Hometown Motors, LLC*, 2020 Tex. App. LEXIS 9235, at *12 (citing *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 616 (Tex. App.—Houston [14th Dist.] 2001, pet. denied)).

Courts of appeals are not factfinders. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). The trial court was the trier of fact in this case and is the sole judge of witness credibility and the weight afforded the testimony. *Hometown Motors, LLC*, 2020 Tex. App. LEXIS 9235, at *12 (citing *GTE Mobilnet*, 61 S.W.3d at 615-16). We may not substitute our own judgment for that of the trier

5

of fact, even if we would reach a different conclusion about the evidence. *Id.*; *Ellis*, 971 S.W.2d at 407.

<u>Evidence at Trial</u>

Appellee testified that she met Appellant in early 2016 and they began dating in late 2016. According to Appellee, she and Appellant moved in together in March 2017 because they loved each other and "wanted to live as a married couple." Appellee explained that they did not officially get married because as part of their Hispanic/Latino culture, "once [they] move in together [they] consider themselves husband and wife." Appellee recalled that Appellant would introduce her to other people as his wife and would call her his "Queen[,]" and she would introduce him to other people as her husband. Appellee testified that they never put a date on their anniversary but would celebrate their marriage every March. Appellee recalled that Appellant took her and her children and his children to California in the summer of 2017 to present Appellee to his dad and his siblings as Appellant's wife. Photographs of gifts Appellee received from Appellant from 2017 until 2022 or 2023 were admitted into evidence. Appellee testified that the gifts in the photographs were for various occasions like Valentine's Day, Mother's Day, Christmas, and birthdays. Appellee explained that the photographs depicted jewelry including a wedding ring that he gave her in March of 2019 or 2020 to celebrate their marriage and a wedding ring he gave her in February of 2023 after she moved out. Appellee testified that the

6

photograph shows the ring box that reads "Forever Bride[]" and that Appellant gave her the wedding ring to remind her that they were husband and wife and that he wanted her to come back. Appellee testified that they lived at his house in Conroe until they moved to Willis in 2018, and the owner of the house in Willis then "owner financed[]" the Willis property and Appellant introduced himself and Appellee as husband and wife to the owners when they purchased that property. Appellee testified that when she and Appellant bought the property, they discussed both contributing money towards the purchase. The 3.3-acre lot was to be investment property for them, and they remodeled and lived in the main house where they lived on the property from 2018 to 2021, then they moved into their "dream home[]" they built on the property, and they also rented out trailer homes on the property. According to Appellee, they did not go through a title company, but Appellant hired an attorney to do the paperwork, and Appellant introduced Appellee to the attorney as his wife. Appellee testified that she and Appellant paid off the loan in about three years and the Release of Lien, which was filed by the sellers with the county and mailed to Appellant, described Appellant and Appellee "[a]s husband and wife[.]" A copy of the Release of Lien was admitted into evidence. Appellee recalled that her children referred to Appellant as "Dad," and Appellant's minor children referred to Appellee as "Mom." Appellee testified that at the time she lived with Appellant she was a stay-at-home mother who cared for her three minor children and Appellant's

7

two minor children, and she cooked, did laundry, took care of Appellant when he was sick, and did "everything that a wife does." Appellee recalled that she and Appellant were each listed as a parent for each of the five minor children on their school enrollment paperwork, and Appellant was listed as an emergency contact for her children. According to Appellee, Appellant would attend meetings with her at the school regarding Appellee's autistic son, and at the meetings Appellant would refer to himself as Appellee's husband. Appellee's tax returns for 2019 through 2022 were admitted into evidence, and they indicate that Appellee filed individually as "head of household[]" for those tax years. Appellee testified that she and Appellant filed taxes individually instead of together because they would get a bigger refund. On cross-examination, Appellee agreed that she had lived with two different men prior to living with Appellant, she was not ever married to either one of them, and they did not "represent as husband and wife." Appellee agreed that the General Warranty Deed and the Deed of Trust for the Willis property admitted as exhibits at trial listed both Appellee's and Appellant's names but did not designate them as husband and wife like the Release of Lien which listed them as "husband and wife." Appellee acknowledged that she and Appellant did not have a joint bank account, did not have a joint credit card, and she never took his name.

Appellant testified that his relationship with Appellee began in 2017. According to Appellant, after he saw her living conditions at her home, he felt sorry

8

for her and her children and invited them to stay at his house. He testified that he slept in the same bed with Appellee, but he was not in love with her. Appellant recalled that in the six years they were together, he never referred to Appellee as his wife but called her "Queen" because "[s]he's part of the family but in [a] different way." He denied that he ever introduced Appellee as his wife to anyone, denied that she introduced him as her husband to anyone, and recalled that her children never called him "Dad," but his children called her "Mom" because they were little. Appellant acknowledged that Appellee cooked for him, did his laundry, and helped with his children. He explained that he attended school meetings regarding Appellee's son who "has that issue" because Appellant "want[ed] to know what's going on with him concerning [Appellant's] two little . . . babies." Appellant testified that he had been married before and that the woman he was married to previously had similar roles to Appellee, but Appellant explained that it was different with Appellee because he treated her "as a woman[]" and "a good person[]" but not as a wife. Appellant agreed that he allowed Appellee to use his credit and debit cards to buy food and necessities for the home like a wife would. Appellant testified that he gave Appellee the gifts in the photographs admitted into evidence because "she's a good woman[]" and she helped him as "a partner[]." He denied knowing anything about the ring in the box that read "Forever Bride[,]" and denied taking it to her house and asking her to come back. As for the other ring, he did not recall the

9

occasion that he gave it to her, and he testified that it was "just a gift[]" and that he had given Appellee's daughter money to get Appellee a gift from her daughter. Appellant testified that during the years he and Appellee lived together he filed his taxes individually as "head of household[,]" based on his tax preparer's advice, and he and Appellee used the same tax preparer. Appellant denied buying the property with Appellee for it to be a place for them to live as husband and wife, and he testified that they purchased it together as investment partners. When showed photographs of himself and Appellee together that were admitted into evidence, Appellant testified that he and Appellee dated and shared good times in the home. Appellant later acknowledged that Appellee was texting someone about property from Appellant's phone and referred to Appellant as her husband and he did not correct her. Appellant explained that although he and Appellee were living together, bought property together, built a home together, and he was supporting her, he did not see the necessity in stopping Appellee from referring to him as her husband. According to Appellant, he did not consider Appellee his wife, he never intended to marry her, and they never discussed being married. Appellant agreed he and Appellee had family gatherings together and traveled together, and he invited Appellee and her children to California to see his father and his family, and when his family asked if they were married, Appellant answered, "No." Appellant testified that he has given other women gifts and jewelry but that does not mean that he was

married to them. Appellant testified that at the time of trial he lived on the Willis property. According to Appellant, he built the home he lives in on the property and at times Appellee helped him in the building process and helped decorate it. Appellant recalled that he later decided to use the house to make an income and not to be a house for them to move into and live together with their children. According to Appellant, he borrowed money from his family to pay the loan off on the property, he paid it off, and Appellee did not contribute to the pay-off. Appellant testified that the Appellee lived with him just over two years, that he had "[t]oo many problems[]" with her, that she was a troublemaker, and he told her she needed to leave or he would take her to court.

Ana Karen Galarza Trevino ("Trevino") testified that Appellee is a friend of Trevino's family. According to Trevino, in 2019 she was looking for a house to rent, and Appellee contacted her. According to Trevino, she went to the house and Appellee and Appellant were painting the house and said it was their house. Trevino testified that Appellant introduced himself as Appellee's husband. On another occasion she saw them at a party holding hands sitting together.

Ashlee Spinks ("Spinks") testified that she was married to Appellee's brother for twenty years. Spinks recalled that Appellant and Appellee "got together" at the end of 2016 or 2017 and that "as long as [Spinks has] known [Appellant and Appellee] as a couple, they have said they were a married couple." Spinks testified

that when she met Appellant and Appellee that they were living together, and Spinks agreed that they were "putting themselves out as husband and wife[.]" According to Spinks, Appellant and Appellee referred to each other as "my husband" and "my wife" and were introduced as husband and wife to Spinks's family and friends. Spinks recalled being around Appellant and Appellee at least twenty or thirty times at holidays and birthday parties and she remembered hearing Appellant refer to Appellee as his wife on several occasions. Spinks testified that she recalled seeing Appellee wearing a wedding ring, but Spinks did not recall one way or the other whether Appellant wore a wedding ring. Spinks recalled that Appellant and Appellee lived together in a house, sold it, and bought another property together, and that they lived "[a]s a married couple[.]" Spinks explained that Appellant and Appellee did not have children together, but each had their own children. According to Spinks, Appellant and Appellee would buy properties together, fix them up, and then rent them. Spinks would go to their home for holidays and birthday parties and noticed that Appellant and Appellee were in pictures with each other's families in the house, and Appellant's children referred to Appellee as "[M]om," and Appellee's children referred to Appellant as "[D]ad." Spinks testified that based on what she saw in the house, she believed that Appellant and Appellee were married. Spinks testified that Appellant owned the home on First Street, Appellee moved into the home, and then they sold it.

Carla Duran ("Duran") identified Appellant and Appellee at trial and testified that she knew them to be husband and wife. She recalled that in 2020 she met Appellant when she inquired with him about renting one of his rental properties and when Duran told him it would not work for her family, Appellant told her there was another property behind it where he and his wife lived and he introduced Appellee as his wife to Duran. Duran testified that she rented a house on the same property as Appellant and Appellee from 2020 to 2023 and saw them frequently, and throughout those years Duran believed Appellant and Appellee were husband and wife. According to Duran, Appellant always introduced Appellee to people as his wife.

Terri Michele DeVance ("DeVance") testified that she lives two houses down from Appellant and that Appellant has been her landlord since April of 2020. DeVance testified that she and other tenants on the property would get together weekly with Appellant and Appellee for "Sunday Funday[]" to socialize and eat. According to DeVance, she did not believe Appellant and Appellee were married and they never indicated to DeVance that they were married. DeVance testified that she never heard Appellant introduce Appellee as his wife or Appellee introduce Appellant as her husband. DeVance did not recall ever seeing a ring on Appellee's left hand. She did recall hearing Appellant's children calling Appellee "Mom[,]" but did not recall hearing Appellee's children calling Appellant "Dad."

13

Luciano Espitia ("Espitia") testified that he lives with DeVance at a rent house rented from Appellant, and Espitia has lived there for about five years. Espitia first met Appellant and Appellee when he was looking for a rental property at which to live, and they did not say anything to him when he met them to indicate that they were husband and wife. According to Espitia, he has been around Appellant and Appellee many times "hanging out[,]" and they have never referred to each other as wife or husband.

Appellant's twenty-seven-year-old son testified that he and his father are "[f]airly close." According to Appellant's son, Appellant has never told him that Appellant was married after he divorced Appellant's son's mother. Appellant's son testified that he would visit his father "maybe every few weekends or so[,]" and he was aware that Appellant and Appellee lived together. Appellant's son recalled hearing his two younger siblings that lived with his father refer to Appellee as "Mom" once or twice, but he never heard Appellee's children refer to Appellant as "Dad."

Analysis

A valid informal, or common-law, marriage consists of three elements: (1) agreement of the parties to be married; (2) after the agreement, their living together in Texas as husband and wife; and (3) their representing to others in Texas that they were married. Tex. Fam. Code Ann. § 2.401(a)(2); *Eris v. Phares*, 39 S.W.3d 708,

14

713 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (citing *In re Estate of Giessel*, 734 S.W.2d 27, 30 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.)). The existence of an informal marriage is a fact question, and the party seeking to establish existence of the marriage bears the burden of proving the three elements by a preponderance of the evidence. *Weaver v. State*, 855 S.W.2d 116, 120 (Tex. App.—Houston [14th Dist.] 1993, no pet.). An informal marriage does not exist "until the concurrence of all three elements." *Eris*, 39 S.W.3d at 713 (citing *Winfield v. Renfro*, 821 S.W.2d 640, 645 (Tex. App.—Houston [1st Dist.] 1991, writ denied)).

### 1. Agreement to be Married

To establish an agreement to be married, "the evidence must show the parties intended to have a present, immediate, and permanent marital relationship and that they did in fact agree to be husband and wife." *Eris*, 39 S.W.3d at 714. A proponent may prove an agreement to be married by direct or circumstantial evidence. *Russell v. Russell*, 865 S.W.2d 929, 933 (Tex. 1993). The testimony of one of the parties to the marriage constitutes some direct evidence that the parties agreed to be married. *Eris*, 39 S.W.3d at 714. Conduct of the parties, cohabitation, and representations to others may constitute circumstantial evidence of an agreement to be married. *Russell*, 865 S.W.2d at 933. However, "[a] finding that there is legally and/or factually sufficient evidence of cohabitation and public representation will not necessarily constitute legally and/or factually sufficient evidence of an agreement to

15

be married." *Id.* "[T]he circumstances of each case must be determined based upon its own facts." *Id.*

The trial court heard Appellee's testimony that she and Appellant moved in together in March 2017 because they loved each other and "wanted to live as a married couple." Appellee testified that she and Appellant celebrated their marriage every March. Photographs were admitted into evidence of jewelry and gifts that Appellant gave to Appellee, including two rings, one of which had a box that had the words "Forever Bride[]" printed on it. The trial court heard Appellee testify that she and Appellant purchased the Willis property and built their "forever home" together, that she did the cooking and cleaning, cared for his and her children, and did "everything that a wife does." Also before the trial court was Appellee's testimony that Appellant and Appellee were each listed as a parent for each of the five minor children on their school enrollment paperwork, Appellant attended school meetings with Appellee regarding her son, Appellant and Appellee would introduce each other as husband and wife to others, that in their culture when a couple moves in together they are considered husband and wife, they traveled together to see family, and her children referred to Appellant as "Dad" and his children referred to her as "Mom." A copy of the Release of Lien for the property they purchased was admitted into evidence and it listed Appellant and Appellee as "husband and wife[.]" The trial court also heard Appellant testify that they traveled together to see family,

16

he allowed Appellee to use his credit and debit cards to buy food and necessities for the home, his children called her "Mom", and Appellee cooked for him, did his laundry, and helped with his children. As the sole judge of the credibility of the witnesses, the trial court could have disbelieved Appellant's testimony that he did not consider Appellee his wife, that her children did not refer to him as "Dad," that he never introduced her to anyone as his wife, that he never intended to marry her, that they never discussed being married, and that they purchased the Willis property together as a business investment and not for them to live together as husband and wife. *See City of Keller*, 168 S.W.3d at 819-21. We conclude that the evidence is legally and factually sufficient to support the element of an agreement of the parties to be married. *See* Tex. Fam. Code Ann. § 2.401(a)(2); *Eris*, 39 S.W.3d at 713; *see also City of Keller*, 168 S.W.3d at 827; *Hometown Motors, LLC*, 2020 Tex. App. LEXIS 9235, at *12.

2. Living Together as Husband and Wife

Cohabitation need not be continuous for a couple to enter into a common-law marriage. *See Bolash v. Heid*, 733 S.W.2d 698, 699 (Tex. App.—San Antonio 1987, no writ). The parties conceded they lived together during the relevant time. Additionally, the evidence as outlined above is legally and factually sufficient to show an agreement to be married, and also legally and factually sufficient to support the element of living together as husband and wife. *See* Tex. Fam. Code Ann.

17

§ 2.401(a)(2); *Eris*, 39 S.W.3d at 713; *see also City of Keller*, 168 S.W.3d at 827; *Hometown Motors, LLC*, 2020 Tex. App. LEXIS 9235, at \*12; *Martinez v. Lopez*, No. 01-09-00951-CV, 2011 Tex. App. LEXIS 4015, at \*8 (Tex. App.—Houston [1st Dist.] May 26, 2011, no pet.) (mem. op.) (when cohabitation was not disputed, appellate court only examined the requirements of agreement to marry and whether the couple held themselves out as a married couple).

3. Presenting to Others

As for the statutory requirement that the parties represent to others that they were married, this requirement "is synonymous with the judicial requirement of 'holding out to the public.'" *Eris*, 39 S.W.3d at 714-15 (citing *Winfield*, 821 S.W.2d at 648). Spoken words are not necessary to establish representation as husband and wife, and this element may be proven by the conduct and actions of the parties. *Id.* at 715. Occasional introductions as husband and wife may not be sufficient to establish the element of holding out. *Id.*; *see also Ex parte Threet*, 333 S.W.2d 361, 364 (Tex. 1960) (evidence that couple was introduced as husband and wife to a few friends was no evidence that they held themselves out as married); *Winfield*, 821 S.W.2d at 651 (two introductions as husband and wife is insufficient to establish that a couple held themselves out as husband and wife). It turns on whether the couple had a reputation in the community for being married. *See Eris*, 39 S.W.3d at 715; *cf. In re Estate of Giessel*, 734 S.W.2d at 31 (couple held themselves out as married

18

when they had reputation in community for being married even though they had kept marriage secret from a few family members).

In this case, the evidence before the trial court included more than an occasional introduction as husband and wife. Here, the trial court had testimony from Spinks that "as long as [Spinks has] known [Appellant and Appellee] as a couple, they have said they were a married couple[,]" that when she met Appellant and Appellee that they were living together and were holding themselves out as husband and wife, they referred to each other as "my husband" and "my wife" and were introduced as husband and wife to Spinks's family and friends, and she recalled seeing Appellee wearing a wedding ring, and that Appellant and Appellee lived "[a]s a married couple[.]" The trial court also heard from Trevino, who testified that Appellant introduced himself as Appellee's husband and that she saw them together at a party acting as a couple. Duran testified that she rented a house on the same property as Appellant and Appellee from 2020 to 2023 and saw them frequently, also testified that throughout those years Duran believed Appellant and Appellee were husband and wife and that Appellant always introduced Appellee to people as his wife. As the sole judge of the witnesses' credibility, the trial court could have believed Appellee, Spinks, Trevino, and Duran, and disbelieved Appellant's, Appellant's son, DeVance's, and Espitia's testimony about whether Appellant and Appellee represented to others that they were married. *See City of Keller*, 168

S.W.3d at 819-21. We conclude that the evidence is legally and factually sufficient to support the element that the parties represented to others that they were married. *See* Tex. Fam. Code Ann. § 2.401(a)(2); *Eris*, 39 S.W.3d at 713; *see also City of Keller*, 168 S.W.3d at 827; *Hometown Motors, LLC*, 2020 Tex. App. LEXIS 9235, at *12.

Viewing the evidence in the light most favorable to the trial court's determination that a common-law marriage existed between Appellant and Appellee, we conclude the evidence before the trial court supported that Appellee had met her burden to present sufficient evidence as to all three elements by a preponderance of the evidence. *See* Tex. Fam. Code Ann. § 2.401(a)(2); *Graham Cent. Station, Inc.*, 442 S.W.3d at 263; *Eris*, 39 S.W.3d at 713; *Weaver*, 855 S.W.2d at 120. Furthermore, considering all the evidence, we cannot say that the trial court's finding of a common-law marriage was so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Hometown Motors, LLC*, 2020 Tex. App. LEXIS 9235, at *12. We overrule issue one.

The Bill Hales Property

In his second issue, Appellant argues the trial court erred when it determined that the property at 2707 Bill Hales Road (the "Bill Hales Property") was not Appellant's separate property. According to Appellant, the evidence at trial established that the Bill Hales Property was purchased solely with Appellant's

20

separate funds, which were adequately traced from the sale of property he owned before the marriage. Appellant argues that the evidence at trial showed that he owned a parcel of real estate prior to living with or marrying Appellee; that separate property was sold and the proceeds were deposited into an account titled in Appellant's name only; Appellant subsequently purchased the Bill Hales Property using those identifiable proceeds; and no commingling or transmutation of funds into community property occurred. Appellant asserts that there was no evidence of commingling that would prevent tracing, there was no evidence that Appellant intended to give the property to the community estate, and Appellee presented no credible evidence rebutting the tracing or demonstrating a community contribution. Appellant contends that the trial court abused its discretion in determining the Bill Hales Property was community property, this decision by the trial court materially impacted the outcome of the case, and it requires a reversal and remand for a correct division of property.

Appellee contends that Appellant did not carry his burden to overcome the community property presumption, his own testimony provided evidence of commingling that defeats tracing, he testified that he had no documentary evidence that separate funds were used to buy the Bill Hales Property, and that the trial court could have credited Appellee's testimony that the Bill Hales Property was acquired as a family home and not an investment.

21

## Standard of Review

The trial court is vested with broad discretion in dividing the community estate, and we presume it properly exercised that discretion. *See Murff v. Murff*, 615 S.W.2d 696, 698 (Tex. 1981). Absent a clear abuse of discretion, we will not disturb that division. *See Bell v. Bell*, 513 S.W.2d 20, 22 (Tex. 1974); *Daigle v. Daigle*, No. 09-14-00399-CV, 2015 Tex. App. LEXIS 9029, at *9 (Tex. App.—Beaumont Aug. 27, 2015, pet. denied) (mem. op.) (citing *Boyd v. Boyd*, 67 S.W.3d 398, 406 (Tex. App.—Fort Worth 2002, no pet.)). An abuse of discretion does not occur where the trial court bases its decisions on conflicting evidence and some evidence supports its decision. *See In re Barber*, 982 S.W.2d 364, 366 (Tex. 1998) (orig. proceeding). "Furthermore, an abuse of discretion does not occur as long as some substantive and probative evidence exists to support the trial court's decision." *Daigle*, 2015 Tex. App. LEXIS 9029, at *9 (citing *Jenkins v. Jenkins*, 16 S.W.3d 473, 477 (Tex. App.—El Paso 2000, no pet.)).

As stated above, the trial court as factfinder is the exclusive judge of the witnesses' credibility and the weight to be given the testimony. *See City of Keller*, 168 S.W.3d at 819-21; *Daigle*, 2015 Tex. App. LEXIS 9029, at **9-10 (citing *Iliff v. Iliff*, 339 S.W.3d 74, 83 (Tex. 2011)). The trial court is free to believe some, all, or none of a witness's testimony. *See Daigle*, 2015 Tex. App. LEXIS 9029, at *10.

22

<u>Analysis</u>

"All property, both real and personal, of a spouse owned or claimed before marriage, and that acquired afterward by gift, devise or descent, shall be the separate property of that spouse . . . ." Tex. Const. art. XVI, §15. The Texas Family Code defines separate property as that property owned by a spouse before marriage, acquired during the marriage by gift, devise, or descent, and the recovery for personal injuries sustained during the marriage. *See* Tex. Fam. Code Ann. § 3.001. Community property consists of the property, other than separate property, acquired by either spouse during the marriage. *See id.* § 3.002. In Texas, property possessed by either spouse during or on dissolution of marriage is presumed to be community property, absent clear and convincing evidence to the contrary. *See id.* § 3.003. Clear and convincing evidence is the degree of proof that will produce in the mind of the trier of fact a firm belief or conviction about the allegations sought to be established. *See id.* §101.007; *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 31 (Tex. 1994). "To overcome this presumption, the spouse that claims the property as separate property must trace and clearly identify the property claimed to be separate, which involves establishing the separate origin of the property with evidence showing the time and means by which the property was acquired by the spouse." *Daigle*, 2015 Tex. App. LEXIS 9029, at *11 (citing *Smith v. Smith*, 22 S.W.3d 140, 144 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (op. on reh'g)).

Property is characterized as either community or separate based on the inception of title to the property. *Id.* (citing *Smith*, 22 S.W.3d at 145). "Inception of title occurs when a party first has a right of claim to the property by virtue of which title is finally vested." *Id.* (citations omitted). If the evidence shows separate and community property has been commingled so as to defy segregation and identification, the burden is not discharged and the statutory presumption prevails. *See McKinley v. McKinley*, 496 S.W.2d 540, 543 (Tex. 1973). "Mere testimony that property was purchased with separate property funds, without any tracing of the funds is generally insufficient to rebut the community presumption." *Daigle*, 2015 Tex. App. LEXIS 9029, at *11. "'Any doubt as to the character of property should be resolved in favor of the community estate.'" *Id.* (quoting *Boyd v. Boyd*, 131 S.W.3d 605, 612 (Tex. App.—Fort Worth 2004, no pet.). "When separate property and community property are commingled in a single account, we presume that the community funds are drawn out first, before separate funds are withdrawn[.]" *Id.*

To determine whether the trial court abused its discretion, we must examine whether the evidence is legally and factually sufficient to support the trial court's conclusion that the Bill Hales Property is community property. *See Boyd*, 131 S.W.3d at 611. We begin by presuming that the property owned upon the dissolution of marriage is community property, a presumption that Appellant could overcome only by a showing of clear and convincing evidence. *See* Tex. Fam. Code Ann. §

24

3.003. The burden of proof rests with Appellant to show by clear and convincing evidence that the funds he used to buy the Bill Hales Property were his separate property. *See Smith*, 22 S.W.3d at 144.

At the trial on the property division, Appellant testified that the Bill Hales Property was purchased in 2020 and is his separate property. According to Appellant, the Bill Hales Property is land that has an uninhabited and unlivable mobile home on it with no water, septic system, or electricity on the property. Appellant testified that the Bill Hales Property was purchased with the proceeds from the sale of his separate property at 101 Nottingham Lane in Conroe, Texas. He recalled that Chicago Title deposited the proceeds from the sale of 101 Nottingham Lane into his bank account at Wells Fargo, and then he paid cash for the Bill Hales Property. Appellant's bank statements for his Wells Fargo checking account during the relevant time period were admitted at trial. One of the bank statements includes an entry on March 18, 2020, indicating a deposit of $170,403.04 from Chicago Title of Texas, and another bank statement includes an entry on May 12, 2020, indicating a "Purchase Bank Check or Draft" for $79,488.06. Appellant testified that he only had bank statements as evidence of the cash payment for the Bill Hales Property and no receipts for the purchase, and Appellant did not present an expert at trial to trace the funds to show it is his separate property. A copy of a cashier's check dated May 12, 2020, for $79,478.06, drawn on Wells Fargo and payable to "CHICAGO TITLE

25

OF TEX[A]S, LLC[,]" was admitted at trial. Appellant testified that the cashier's check was drawn from his Wells Fargo checking account and that the funds were used to purchase the Bill Hales Property. Appellant testified that during that time period all of his income from working was going to that Wells Fargo account and that between March of 2020 and May of 2020 there was money coming in and out of the Wells Fargo account. Appellant testified that since March of 2017 he has been consistently working and has had two accounts – a Wells Fargo checking account and a Wells Fargo savings account. He testified that he deposits some of his income into his Wells Fargo accounts and keeps some of this income as cash, and sometimes he purchases what he needs in cash and puts the leftover amounts in his account.

Appellee testified that although she was not an authorized signatory on Appellant's Wells Fargo account, she had access to the account because she had online access to the account and Appellant allowed her to use his debit card to pay bills, purchase groceries and anything for the house, and to get gas. Appellee recalled that during their marriage, "[w]e would put the money in the account[] [and] [h]e gave me access[] [and] his pin number[;] [h]e told me to download the app, make a sign-in for the app on his phone and login[;]" she did some physical transactions like writing checks on the account and signing for him; and that she had full access to his account. Appellee testified that throughout the marriage she was collecting cash from the renters on the properties that she and Appellant rented out, and she and

26

Appellant would use the cash in addition to the money that was in the Wells Fargo account. Appellee disagreed with Appellant's position that the Bill Hales Property is his separate property. Appellee wanted the trial court to declare the property as community property. Appellee recalled that she and Appellant searched for and purchased the land because they wanted to grow their business more and put more mobile homes on it to rent. According to Appellee, the Wells Fargo bank account statements show deposits and withdrawals made during that time period, but she could not identify from those statements what money was used or not used for the purchase of the Bill Hales Property. Appellee testified during the marriage that she and Appellant cleared the property and cleaned the mobile home and repaired it, that there is now water and electricity and septic for the property, and that Appellant has since posted the property for rent.

The trial court could have believed some, all, or none of Appellant's or Appellee's testimony. *See Daigle*, 2015 Tex. App. LEXIS 9029, at *10. The trial court could have weighed the evidence presented about the Bill Hales Property, the cashier's check drawn from the Wells Fargo account, the testimony that Appellee deposited rent from rental properties purchased during their marriage into the account, and that Appellee had access to the account and the funds in the account. On this record, Appellant failed to provide clear and convincing evidence sufficient to overcome the presumption of the community property. We conclude the evidence

27

is legally and factually sufficient to support the trial court's determination that the Bill Hales Property was community property. Substantive and probative evidence exists to support the trial court's decision. *See id.* at *9. Accordingly, the trial court did not abuse its discretion in characterizing the Bill Hales Property as community property. *See id.* We overrule issue two.

## Exclusion of Exhibits

In his third issue, Appellant argues the trial court abused its discretion when it excluded Appellant's Exhibits 7, 8, 9, 10, and 15 at trial. Although Appellant concedes these exhibits were not timely disclosed thirty days before trial as required by the trial court's Standard Order, Appellant argues the trial court abused its discretion in not admitting these exhibits under Texas Rule of Civil Procedure 193.6(a) because Appellee was not unfairly surprised or prejudiced because she had actual notice of the existence of the exhibits well before trial.

Appellee argues that it was within the trial court's discretion under Rule 193.6 to exclude the exhibits. Appellee also asserts that Appellant did not preserve this issue for appeal because he failed to make an offer of proof or bill of exception concerning these exhibits. Appellee also argues that, even if Appellant had preserved his complaint, the trial court did not abuse its discretion in excluding the exhibits because any error was harmless.

28

Standard of Review

Appellate courts review complaints about rulings excluding evidence using an abuse of discretion standard of review. *JBS Carriers, Inc. v. Washington*, 564 S.W.3d 830, 836 (Tex. 2018). A trial court abuses its discretion when it acts without regard to guiding rules or principles. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012) (citing *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998)). "The trial court has extensive discretion in evidentiary rulings, and we will uphold decisions within the zone of reasonable disagreement." *Diamond Offshore Servs. Ltd. v. Williams*, 542 S.W.3d 539, 545 (Tex. 2018). Even if the trial court abused its discretion in ruling on the admission or exclusion of certain evidence, reversal is appropriate only if the error was harmful—that is, it probably resulted in an improper judgment. *See Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995); *see also* Tex. R. App. P. 44.1. A successful challenge to a trial court's exclusion of evidence usually requires the complaining party to show that the judgment turns on the evidence excluded. *See Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000) (citing *Alvarado*, 897 S.W.2d at 754). On appeal, the court reviewing the trial court's ruling must decide whether the error "probably caused the rendition of an improper judgment[.]" Tex. R. App. P. 44.1(a)(1); *see JBS Carriers, Inc.*, 564 S.W.3d at 836.

29

Analysis

Assuming without deciding that the Appellant preserved error on the exclusion of the exhibits, we conclude the trial court did not abuse its discretion in excluding the evidence under Rule 193.6 of the Texas Rules of Civil Procedure. Rule 193.6 provides

> **(a) Exclusion of Evidence and Exceptions.** A party who fails to make, amend, or supplement a discovery response, including a required disclosure, in a timely manner may not introduce in evidence the material or information that was not timely disclosed, or offer the testimony of a witness (other than a named party) who was not timely identified, unless the court finds that:
>
> > (1) there was good cause for the failure to timely make, amend, or supplement the discovery response; or
> >
> > (2) the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties.
>
> **(b) Burden of Establishing Exception.** The burden of establishing good cause or the lack of unfair surprise or unfair prejudice is on the party seeking to introduce the evidence or call the witness. A finding of good cause or the lack of unfair prejudice must be supported by the record.
>
> **(c) Continuance.** Even if the party seeking to introduce the evidence or call the witness fails to carry the burden under paragraph (b), the court may grant a continuance or temporarily postpone the trial to allow a response to be made, amended, or supplemented, and to allow opposing parties to conduct discovery regarding any new information presented by that response.

Tex. R. Civ. P. 193.6. This Court has interpreted subsection (a) of the Rule as follows:

30

> The plain language of the Rule indicates that where a party fails to timely supplement, the party "may not introduce in evidence the material or information that was not timely disclosed[.]" [] It does not state that claims are barred, although evidence supporting those claims may be excluded. []

*Salsman v. Salsman*, No. 09-23-00379-CV, 2025 Tex. App. LEXIS 9308, at **20-21 (Tex. App.—Beaumont Dec. 4, 2025, pet. denied) (mem. op.) (citations omitted). Appellee timely objected to the admission of Appellant's Exhibits 7, 8, 9, 10, and 15 at trial on the basis that they were produced in an untimely manner on October 31, 2024, outside the discovery period and on the day before the pre-trial conference and docket call, and the suit had been on file since September of 2023. The trial court asked Appellant's counsel why these exhibits were produced untimely, and Appellant's counsel responded that his client did not provide them to him until October 31, 2024. The trial court sustained Appellee's objections to the exhibits.

On this record, the trial court could have reasonably determined that Appellant did not meet his burden of establishing good cause or the lack of unfair surprise or unfair prejudice under Rule 193.6. *See* Tex. R. Civ. P. 193.6(b), (c). Accordingly, the trial court's exclusion of Appellant's Exhibits 7, 8, 9, 10, and 15 was within the zone of reasonable disagreement and did not amount to an abuse of discretion. *See JBS Carriers, Inc.*, 564 S.W.3d at 836; *Diamond Offshore Servs. Ltd.*, 542 S.W.3d at 545. We overrule issue three.

Reimbursement Claim

In his fourth issue, Appellant argues the trial court erred in determining that Appellant did not have a reimbursement claim against the community for $240,653. According to Appellant, his uncontroverted testimony established he had a valid reimbursement claim for $240,653 in separate property funds and loans from his siblings toward the acquisition, improvement, and maintenance of community property during the marriage. He asserts that his Exhibits 7, 8, 9, 10, and 15 (the excluded exhibits discussed above) were "critical to corroborate and document Appellant's testimony, particularly to satisfy tracing and documentation requirements under Texas law[,]" and the trial court's exclusion of those exhibits hampered Appellant's ability to substantiate his reimbursement claim. Appellant argues that his sworn testimony as to his reimbursement claim was not refuted by Appellee and the exclusion of his corroborating exhibits contributed materially to the denial of his reimbursement claim.

Standard of Review and Analysis

A reimbursement claim exists when one or both spouses use the property of one marital estate to confer on a different marital estate a benefit which, if not repaid, would result in unjust enrichment to the benefitted estate. *See* Tex. Fam. Code Ann. § 3.402(a); *see, e.g., McCartney v. McCartney*, 720 S.W.3d 789, 798 (Tex. App.— Houston [14th Dist.] 2025, no pet.) ("[A] community marital estate is entitled to

reimbursement for community property funds used to enhance the separate property of one of the spouses."). Reimbursable claims include (1) payment of a debt, liability, or expense; (2) improvements on real property; and (3) use of a spouse's time, toil, or talent. *See* Tex. Fam. Code Ann. § 3.402(c). The party claiming the right of reimbursement must prove that the expenditures were made and are reimbursable. *Vallone v. Vallone*, 644 S.W.2d 455, 459 (Tex. 1982). "Reimbursement is not available as a matter of law[] but lies within the discretion of the court." *Id.* We will not disturb the trial court's ruling on a claim for reimbursement, absent a clear abuse of discretion. *Id.* at 460.

During his testimony, Appellant indicated that he had documentation to support his reimbursement claim, and on appeal, Appellant argues that the trial court abused its discretion in excluding this corroborating documentation that is critical to his reimbursement claim. We have already determined that the trial court did not abuse its discretion in excluding this documentation under Rule 193.6. As the factfinder, the trial court was entitled to reject Appellant's testimony and conclude that Appellant failed to meet his burden of proving a right to reimbursement. *See Hometown Motors, LLC*, 2020 Tex. App. LEXIS 9235, at *12 (citing *GTE Mobilnet*, 61 S.W.3d at 615-16). We cannot reweigh the evidence or substitute our judgment for that of the trial court. *See Ellis*, 971 S.W.2d at 407. Accordingly, we conclude

that the trial court did not abuse its discretion in denying Appellant's claim for reimbursement. *See Vallone*, 644 S.W.2d at 459-60. We overrule issue four.

## Conclusion

Having overruled all of Appellant's issues on appeal, we affirm the trial court's judgment.

AFFIRMED.

LEANNE JOHNSON<br>
Justice

Submitted on June 19, 2026
Opinion Delivered July 23, 2026

Before Golemon, C.J., Johnson and Chambers, JJ.